John M. RIOS et al., Plaintiffs,

and

The Habilitat et al., Plaintiffs in Intervention,

v.

Earl BUTZ, etc., Defendant.

No. C–74–1372 ACW.

United States District Court, N. D. California.

Dec. 20, 1976.

Robert M. Teets, Jr., Richard H. Hart, Jr., California Rural Legal Assistance, San Francisco, Cal., Lorelei Borland, Jay Lipner, Food Research & Action Center, New York City, Evan R. Shirley, Honolulu, Hawaii, for plaintiffs.

Richard F. Locke, Asst. U. S. Atty., San Francisco, Cal., for defendant.

MEMORANDUM OPINION

WOLLENBERG, District Judge.

This class action for declaratory and injunctive relief claims that the Department of Agriculture's (USDA) delay in implementing the Congressional mandate for food stamp eligibility for drug addicts and alcoholics in treatment and rehabilitation programs was unnecessary and unreasonable. After this lawsuit was filed, the implementing regulations were in fact promulgated. Plaintiffs seek retroactive benefits because of the allegedly unnecessarily long delay.

In an order dated May 16, 1975, this Court held that it had jurisdiction over this action and certified the following class:

Participants in all alcoholic and narcotics addict rehabilitation programs eligible for food stamps pursuant to Section 3(a) of

Public Law 93–86, 87 Stat. 246 (August 10, 1973).[1]

The case came on for trial before the Court on July 1, 1976.

Public Law 93–86 (the "Amendments") made several changes in the Food Stamp Act of 1964. Those changes relevant to this lawsuit are:

(1) Section 3(a)(2) of the Amendments modified 7 U.S.C. § 2012(e) by enlarging the definition of "household" to include:

any narcotics addict or alcoholic who lives under the supervision of a private nonprofit organization or institution for the purpose of regular participation in a drug or alcoholic treatment and rehabilitation program.

(2) Section 3(c) of the Amendments established standards for determining which treatment and rehabilitation programs would be covered under the new law by adding subsection (n) to 7 U.S.C. § 2012.

(3) Section 3(d) of the amendments added 7 U.S.C. § 2014(d), which provides that:

The Secretary [of the Department of Agriculture] shall establish uniform national standards of eligibility for households described in section 2012(e)(3) of this title [i. e., for alcoholics and narcotics addicts covered by the Food Stamp Act].

(4) Section 3(f) of the Amendments added 7 U.S.C. § 2019(i) and provided that members of rehabilitation programs covered by the Act may use coupons issued to them to purchase meals served to them during the course of the program, and that these meals will be considered food for the purposes of the Food Stamp Act.

Public Law 93–86 was signed into law on August 10, 1973. Various members of the Department of Agriculture's Food and Nutrition Service (FNS) and its Food Stamp Division (FSD) were aware of the legislation. On August 9, 1973, the FSD Director outlined the changes he felt were required by the new law, indicated that proposed changes could be ready in six weeks, and predicted that comments on the proposed changes could be analyzed promptly and the final regulations published by the beginning of January, 1974.[2] By September 14, 1973, a preliminary draft of the proposed regulations was circulated within FNS. A meeting was to be held on the proposals on September 26, and publication of the proposed regulations in the Federal Register was planned for October 5, 1973. The proposals covered many changes in USDA regulations that were unrelated to those covering the eligibility of narcotics addicts and alcoholics in rehabilitation programs.[3]

For some reason, this timetable was not met. Around the beginning of October, comments concerning the regulations came in from various regional offices. However, it is clear that by November 20, 1973, an entire package of proposed regulations had been approved by the Office of the General Counsel (OGC) of USDA. Furthermore, except for the proposed regulations dealing with work registration requirements and workers out on strike (see 7 U.S.C. § 2014(c)), the entire package of proposed regulations had also been approved by the Office of Management and Budget (OMB) in the White House by that date.[4]

A protracted period of negotiations between USDA, OMB, and the Department of Labor over the work registration requirements then followed. Although there were no objections to publication of the other proposals, USDA decided that all revised regulations should be published as a package. Consequently, notice of the proposed

---

**1.** Plaintiff Rios and plaintiffs-intervenors Comiskey and Umiamaka are representatives of this class.

**2.** Plaintiffs' Exhibit BB.

**3.** Plaintiffs' Exhibit CC.

**4.** Plaintiffs' Exhibit EE.

rulemaking was not published in the Federal Register until January 28, 1974. 39 Fed. Reg. 3642 et seq.

The only change between the proposed and final regulations implementing eligibility for the class members was the addition of a requirement that the rehabilitation organization serve as the authorized representative of its residents. Numerous comments were received on proposed regulations unrelated to those pertinent to this case, but this change did not come about as a result of public comment.[5] The basis for this change was a trip to New York City by three FSD branch chiefs in late March of 1974. A detailed report on the trip was not made to the FSD Director until April 24, 1974. It outlined the differences of opinion of the branch chiefs on the authorized representative question.[6] By May 6, 1974, a formal request to the OGC on the authorized representative problem was made or about to be made.[7] Final recommendations on this problem were not made to the Director of FSD until June 26, 1974. There were some other problems resolved with respect to the regulations affecting the class members, but the dates of activities concerning those problems are not clear.[8]

In the meantime, a schedule for promulgation of the entire package of regulations was approved by the Assistant Secretary of USDA on April 12, 1974. This schedule called for the final regulations to be typed up by May 15 and published in the Federal Register by June 1, 1974.[9] This schedule was not met, and publication did not occur until July 15, 1974. The states were given three months to implement the changes required by the new regulations.[10]

It is clear that there was considerable delay in the promulgation of these regulations. While the first proposals were apparently ready around the end of October, 1973, publication was held up at least two to three months because of the bureaucratic negotiations over the work registration requirements. The field trip to New York did not occur until March of 1974 and the resolution of the authorized representative problem and other problems did not take place until the late spring of 1974. The examination of these problems was not prompted by public comments, and there was no need to wait over six months after passage of the new law before fully delving into the matter. Changes in the proposed regulations could have been recommended even prior to their publication.[11] Work on these particular regulations even went past the deadline set for the entire package of regulations, a deadline approved by one of the highest ranking officials in USDA.

■ Defendant relies heavily on the need to promulgate the new regulations, along with new instructions to the states, as a package as a justification for the delays in implementing the mandate of Public Law 93–86. Good administrative policy, the desire to help state agencies by avoiding a bewildering number of changes in regulations, and the desire to follow perceived Congressional wishes to achieve overall comprehensive reform of the food stamp program allegedly were the reasons for maintaining the package approach involved in this case. The package, however, involved regulations mandated by Public Law 93–86, regulations mandated by various court decisions, and changes desired by USDA for other reasons, and there was no logical nexus between these three groups of proposed new regulations. Significantly, the work registration regulations were the product of USDA's own initiative as part of

---

5. See 39 Fed.Reg. 25997 (July 15, 1974).

6. Plaintiffs' Exhibit II.

7. Plaintiffs' Exhibit PP.

8. Deposition of Barbara O'Neil, pps. 25–28.

9. Defendant's Exhibit A76.

10. Plaintiffs have accepted a 90-day period to allow the states to implement new regulations as reasonable in some situations. Plaintiffs' Trial Brief and Memorandum in Support of Summary Judgment, filed June 28, 1976, p. 31. There is no evidence that the 90-day period was unreasonably long for the package of regulations involved here.

11. Defendant's Exhibit A68.

its response to perceived political pressures. These regulations were not required by any new legislation or court decision, but their promulgation caused a major delay in implementing a program specifically mandated by Congress.

Furthermore, the evidence shows that this "package" approach to promulgating regulations is not, in fact, an accurate description of defendant's ordinary practices. Various regulations in response to new laws, court decisions, and those made in accord with the Department's general rule-making authority are promulgated at various times throughout the year.[12] Defendants have not adequately explained why the changes mandated by Public Law 93–86 had to be packaged with other unrelated changes when less than comprehensive changes in the regulations have been continuously promulgated both before and after the passage of Public Law 93–86.

Finally, as discussed previously, it would appear that the regulations pertinent to the class were the ones that held up promulgation of the package rather than the other way around. They were still being formulated after the deadline set for the entire package by the Assistant Secretary. There is no basis in the record to support a contention that insufficient personnel caused the delays involved here.

While it is not possible to determine the exact reason why eligibility standards for class members were delayed so long,[13] consideration of all the evidence compels the Court to conclude that the delay in implementation of the regulations was unreasonable. While some action was being taken, the slow pace operated, in effect, as an unreasonably lengthy denial of eligibility to a group specifically determined by Congress to need food stamps in order to insure a nutritionally adequate diet. At best, administrative convenience took precedence over this Congressional mandate. The unreasonable delay was contrary to the purposes of the Amendments to the Food Stamp Act and impermissibly abused the discretion committed to the Department for the purposes of administering the food stamp program.

A determination of appropriate relief for the class does not, however, follow automatically from this conclusion. When the lawsuit was first filed, there were no regulations. Since the subsequent publication of the regulations has obviated the need for a court order requiring publication that was, in effect, requested in the complaint, plaintiffs propose two other forms of relief: retroactive relief and the establishment of a timetable for the future promulgation of regulations.

■ Assuming, *arguendo*, that the Court would have ordered a timetable for promulgation of the regulations in question here had plaintiffs moved expeditiously for a preliminary injunction shortly after the lawsuit was filed, it does not follow that such a timetable should be ordered for future USDA rulemakings. The cases relied upon by plaintiff involve unremedied violations of statutory directives or general court orders to achieve a specific result and do not involve blanket rules covering all possible future situations. While there has been a determination that the delay in this case was unreasonable, there has been no determination concerning the alleged delays in the promulgation of other regulations. At the very least, the absence of specific timetables in the Food Stamp Act itself is evidence that Congress has no general complaint about the timeliness of the Department's rulemaking activities. It would be unwieldly to impose specific guidelines for the variety of situations that may arise in the future and improper on the basis of the present case to involve the courts in the automatic and continuing supervision of all future rulemaking in the food stamp program. Furthermore, with the impending appointment of a new Secretary of Agriculture, it would be improper to presume that

12. Plaintiffs' Exhibit GG.

13. Defendant's Exhibit A81 shows that there was considerable hostility within the Department towards the new program.

any unreasonable rulemaking delays attributable to the present administration of the Department will be continued by the new administration.

The principle of providing retroactive benefits in cases of administrative error (which may include denial of benefits because of an erroneous interpretation of the law) is not a new one. Basic to this form of relief is a determination of when eligibility should have in fact begun. It is unrealistic to assume that eligibility should have begun in the absence of implementing regulations on the day Public Law 93–86 became effective, especially in light of the Congressional direction to the Department in Section 3(d), 7 U.S.C. § 2014(d), to establish eligibility standards. Consequently, in the May 16, 1975, order denying plaintiffs' motion for summary judgment, the Court noted that "in order to obtain retroactive benefits Plaintiffs will have to show the earliest date by which the Amendments here in question could reasonably have been put into effect."

With all the evidence now in, it is clear that no precise date can be chosen—only an approximation of a reasonable date for the publication of final regulations can be made. The picture is further complicated because it must be presumed that all participants in appropriate rehabilitation programs would not have applied for food stamps immediately after they became eligible to do so. Participation in a rehabilitation program does not mean automatic receipt of food stamps. This presumption would hold true no matter what date is chosen as being an appropriate one for pub-

lication of the final regulations. These considerations place this case in a decidedly different posture from the ones where retroactive benefits were granted for amounts and/or periods of time that were definitely ascertainable.[14]

Plaintiffs themselves have recognized that this case involves more than just an action for retroactive benefits. They state that the granting of retroactive benefits will also "have the prophylactic effect of discouraging such inordinate delays in future administrative rulemaking."[15] Considering this factor, plus the fact that the eligibility date for class members would have depended upon some initiative on their part, it is also appropriate to consider the timing of this lawsuit. Plaintiffs maintain that the final regulations should have been published by December 1, 1973. However, this action was not filed until June 28, 1974. While plaintiff Rios was not a rehabilitation program resident until April, 1974, both plaintiff-intervenors Comiskey and Umiamaka had been rehabilitation program residents long before Public Law 93–86 was passed.[16] The plaintiffs' claims of irreparable harm because of the delay in publishing the regulations are considerably diminished by their own delay before filing suit. Therefore, upon consideration of all the evidence introduced, the impossibility of choosing with certainty the appropriate date for the publication of final regulations, and the need of plaintiffs to exercise some initiative to insure consideration of their eligibility claims and their claims of unreasonable government delay, the Court concludes that the date this lawsuit was filed is an appro-

---

**14.** The cases cited at page 33 of Plaintiffs' Trial Brief, *supra,* deal either with erroneous terminations, non-issuance of benefits or with improper calculations of the income of an applicant or recipient. In each case, some definite administration action caused the need for retroactive benefits. The regulations referred to on that page of plaintiffs' brief, properly cited as 41 Fed.Reg. 11466 (March 19, 1976), also deal only with definite administrative actions that result in overcharges, denials, or terminations that can be corrected by the restoration of benefits from the date the erroneous action took place.

The problem of determining when eligible households were entitled to benefits when such benefits had been delayed is not covered by the Department rules promulgated March 19, 1976, but is covered by proposed rules. However, even the proposed rules calculate the amount of benefits from a specific date which depends upon the date of application for benefits. See 41 Fed.Reg. 11465, 11532–3 (March 19, 1976).

**15.** Plaintiffs' Trial Brief, *supra,* p. 34.

**16.** Exhibits C and D to the Complaint in Intervention, filed July 15, 1974.

priate choice for the date the final regulations should have been published.[17]

The regulations were actually published approximately two weeks after suit was filed. These dates are so close that, considering the difficulties in administering retroactive relief and the need, as plaintiffs maintain, for four subclasses, it would not be appropriate to require retroactive relief for such a short period of time. Accordingly, the Court declines to order the awarding of retroactive benefits to members of the class.

The above memorandum of opinion constitutes the Court's findings of fact and conclusions of law. Rule 52(a), Federal Rules of Civil Procedure.

---

**17.** In *Turchin v. Butz,* 4–74 Civ. 622 (D.Minn. April 9, 1976), relied upon by plaintiffs, it should be noted that relief was granted only to those who were affected by improper administrative action on or after the date the district court granted summary judgment in favor of the plaintiffs therein. See Plaintiffs' Exhibit LL.